**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

SAMAT MENDIBAEV,

    *Petitioner*,

v.                                        1:25-cv-01308-DHU-GBW

TODD LYONS, JOEL GARCIA,
KRISTI NOEM, PAMELA BONDI,
and GEORGE DEDOS,

    *Respondents*.

## ORDER GRANTING HABEAS PETITION

This matter comes before the Court on Petitioner Samat Mendibaev's Petition for Writ of Habeas Corpus ("Petition"). Doc. 1. Petitioner alleges that he was unlawfully re-detained by Immigration and Customs Enforcement ("ICE") after previously being paroled into the United States to seek asylum, in violation of the Due Process Clause of the Fifth Amendment. The Petition asks the Court to order Petitioner's immediate release. Having carefully considered the parties' briefs, their oral arguments, and the relevant and applicable law, the Court finds that the Petition should be **GRANTED IN PART**.

**I.**
**BACKGROUND**

Petitioner Samat Mendibaev is a native and citizen of Kyrgyzstan who entered the United States on August 16, 2023 with his spouse and two minor children to seek asylum. Doc. 1 at ¶ 20 (citing Ex. A). At that time, the Department of Homeland Security ("DHS") issued him a Notice to Appear ("NTA") charging him with inadmissibility. *Id.* Petitioner and his family were paroled into the United States to seek asylum, pursuant to 8 U.S.C. § 1182(d)(5)(A). *Id.* at ¶ 21 (citing Ex.

C). During this time, Petitioner and his family developed deep ties with their community and, consistent with the very purpose of their parole, pursued legal pathways to residency in this country. *Id.* at ¶ 22 (citing Ex. D). On July 10, 2024, Petitioner filed an asylum application, which remains pending. *Id.*

Petitioner's parole was originally valid through August 15, 2025. *Id.* at ¶ 23; *see also* Ex. C. However, according to Petitioner, it was terminated in April pursuant to a "nationwide, blanket termination policy affecting noncitizens who entered at a land port of entry using the CBP One application." *Id.* On or about October 23, 2025, ICE re-detained Petitioner while he was working as an Uber driver. *Id.* at ¶ 1. While Petitioner is detained, he remains separated from his two young children and his wife, who are derivatives of his asylum application. *Id.* at ¶¶ 24-25. In his absence, the family faces significant financial hardship, as Petitioner's wife has a disability due to a brain tumor that prevents her from working. *Id.*

On December 28, 2025, Petitioner filed a Petition for Writ of Habeas Corpus. The Petition alleges that the government unlawfully re-detained Petitioner, after he was previously released on parole and without showing a change in circumstances or another legal basis for re-detention. *Id.* at ¶¶ 2-3. Petitioner argues this violated his Fifth Amendment right to due process and asks that this Court:

1) Assume jurisdiction over this matter;

2) Order that Petitioner not be transferred outside the District of New Mexico or removed from the United States during the pendency of this action;

3) Issue an order to show cause ordering Respondents to show cause why his Petition should not be granted within three days;

4) Declare that Petitioner's detention is unlawful;

5) Issue a writ of habeas corpus and order Petitioner's immediate release from ICE custody; and

6) Grant any further relief this Court deems just and proper.

*Id.* at 10-14.

On February 4, 2026, Respondents submitted their Response. In it, the Government asks this Court to deny the Petition, as Petitioner is lawfully detained pursuant to 8 U.S.C. § 1225(b). Doc. 15 at 1, 7. Respondents do not dispute that Petitioner's parole was revoked in April 2025. *Id.* at 2. Citing 8 U.S.C. § 1182(d)(5)(A) and *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103, 140 (2020), Respondents argue that when parole ends, the noncitizen "shall forthwith return or be returned to the custody from which he was paroled" and "his case shall continue to be dealt with in the same manner as that of any other applicant for admission." Doc. 15 at 2. Accordingly, the Government's position is that Petitioner remains subject to mandatory detention. Further, the Government asserts that as an "arriving alien," Petitioner is not entitled to any additional due process beyond that specifically prescribed by statute. *Id.* at 1, 7. Even if he was, Respondents contend that the balancing of the *Mathews* factors weighs in favor of the Government and does not support immediate release.

On February 5, 2026, the Court held a hearing on this matter. At the hearing, counsel for Petitioner did not dispute that Petitioner is subject to § 1225, but she argued that Petitioner was nevertheless denied the due process owed to him, via the regulations, because he was not given proper notice of the revocation of his parole and it was not based on an individualized determination. Counsel for the Government asserted that written notification did go out in April, but even if this was not sufficient, when Petitioner was detained, the original term of his parole had expired. As such, habeas relief is not warranted. In response, Petitioner's counsel asserted that

Petitioner developed a liberty interest in release and should have had an opportunity to be heard on why parole should not be revoked. The Court took the parties' arguments under advisement and allowed a Reply brief from Petitioner.

Petitioner submitted his Reply on February 19, 2026. In the Reply, Petitioner argues that because he has been living in the United States for an extended period, his rights are not limited in the same way as other noncitizens actively "arriving" or "seeking admission," and the authority for his detention has shifted to § 1226. Doc. 17 at 2 (citing *Walizada v. Trump*, 2025 WL 3551972 (D. Vt. Dec. 11, 2025); *Hyppolite v. Noem*, 808 F.Supp.3d 474 (E.D.N.Y. 2025)). Even assuming Respondents can invoke § 1225(b), Petitioner argues that *Thuraissigiam* does not apply to limit Petitioner's due process rights because that case was limited to challenges to admission and admissibility—not detention-related due process claims. *Id.* Petitioner therefore argues that he is entitled to immediate release because he was re-detained without notice and an opportunity to be heard on why he should not be re-detained. *Id.* at 14. Alternatively, Petitioner asks for a prompt custody hearing consistent with § 1226(a) and procedural due process. *Id.* at 17.

## II.
## LEGAL STANDARDS

Habeas relief is available when a person "is in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c)(3). The Fifth Amendment's Due Process Clause prohibits the Government from depriving any person of liberty without due process of law. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690, 121 S.Ct. 2491 (2001). The Due Process Clause's protections extend to all persons

in the United States, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693.

The Immigration and Nationality Act ("INA") and its implementing regulations outline the appropriate procedures for the detention and removal of noncitizens without legal status in the U.S. "Noncitizens who arrive at a port of entry without a visa or other entry documents . . . are deemed 'inadmissible' under 8 U.S.C. § 1182(a)(7)." *Y-Z-L-H v. Bostock*, 792 F.Supp.3d 1123, 1132 n.7 (D. Or. 2025). Once a noncitizen is deemed inadmissible, "the immigration officer must order the noncitizen's removal unless the noncitizen indicates an intention to apply for asylum or fear of persecution." *Id.* (citing 8 U.S.C. § 1225(b)(1)(A)(i)). The government may place the noncitizen into expedited removal proceedings, *see* 8 U.S.C. § 1225(b)(1), or the government may place the noncitizen into regular removal proceedings under 8 U.S.C. § 1229(a). *See id.*

Two provisions of the INA govern the detention of noncitizens with pending removal proceedings. *See* 8 U.S.C. §§ 1225, 1226. Section 1225 mandates detention of noncitizens subject to expedited removal under § 1225(b)(1) and certain "applicant[s] for admission" under § 1225(b)(2). "[I]n the case of [a noncitizen] who is an applicant for admission, if the examining immigration officer determines that [a noncitizen] seeking admission is not clearly and beyond a doubt entitled to be admitted, the [noncitizen] **shall** be detained" for removal proceedings, absent some extraordinary circumstances not applicable here. § 1225(b)(2)(A) (emphasis added).

However, under 8 U.S.C. § 1182(d)(5)(A), "applicants for admission may be temporarily released [into the United States] on parole 'for urgent humanitarian reasons or significant public benefit.'" *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018). The decision to grant parole is determined "on a case-by-case basis" and rests within the discretion of the Secretary of Homeland Security. § 1182(d)(5)(A). Then, "when the purposes of such parole shall, in the opinion of the

Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]" *Id.* Termination of parole under these circumstances requires notice, 8 C.F.R. § 212.5(e)(2), unless the noncitizen parolee departs from the United States or the time for which parole was authorized expires, in which cases parole automatically terminates without notice, § 212.5(e)(1).

## III.
## DISCUSSION

### A. Petitioner's re-detention after the expiration of his parole was lawful.

Petitioner alleges that his parole was unlawfully revoked in April 2025 through a blanket termination policy. Doc. 1 at ¶ 23. In addition to providing for parole, section 1182(d)(5)(A) states that "when the purposes of such parole shall, in the opinion of the Secretary of Homeland Security, have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled[.]" This seemingly grants the executive branch broad discretion to determine when the purposes of parole have been served and to revoke parole accordingly. However, Supreme Court and Tenth Circuit precedent suggests parole decisions must be individualized, rendering a blanket termination, sent out via mass email to thousands of parolees, invalid. *See Jean v. Nelson*, 472 U.S. 846, 857 (1985) (requiring individualized determinations as to parole under § 1182(d)(5)(A)); *Marczak v. Greene*, 971 F.2d 510, 515 (10th Cir. 1992) (same).

However, Petitioner was detained in October 2025. At that point, whether his parole was lawfully terminated in April 2025 was irrelevant because his parole term expired in August 2025. Section 1182's implementing regulations clarify that parole automatically terminates **without written notice** upon a noncitizen's departure from the United States or **at the expiration of the time for which parole was authorized**. 8 C.F.R. § 212.5(e)(1) (emphasis added). And the Tenth

6

Circuit has made clear that the Due Process Clause does not provide noncitizens in Petitioner's position a liberty interest in being released on parole. *Sierra v. INS*, 258 F.3d 1213, 1218 (10th Cir. 2001). As a result, the only process with respect to admission or parole to which these noncitizens are entitled is that provided for in the statute and/or regulations. *See DHS v. Thuraissigiam*, 591 U.S. at 140 (Noncitizens who have not "effected an entry" into the country have "only those rights regarding admission that Congress has provided by statute."). Because the statute and regulations require no notice or additional process for parolees whose parole term expires, Petitioner was not entitled to any additional process before his parole could end.

**B. Petitioner is an "arriving alien" subject to mandatory detention under § 1225(b)(1).**

Petitioner entered the country at a port of entry and is therefore an "arriving alien" as defined in the INA's implementing regulations. 8 C.F.R. § 1.2. Before his parole, Petitioner was subject to mandatory detention under § 1225(b)(1)(B)(ii), which states that noncitizens seeking asylum who have passed a credible fear interview "**shall** be detained for further consideration of the application for asylum" (emphasis added). The INA's implementing regulations regarding parole confirm that this same provision applies after Petitioner's parole expires. When parole expires or is terminated, the noncitizen "shall be restored to the status that he or she had at the time of parole." 8 C.F.R. § 212.5. And 8 C.F.R. § 1.2 makes clear that parolees are "arriving aliens" and remain so even after any such parole is terminated or revoked. At least one other court in this district has found that a noncitizen detained by DHS upon revocation of his parole returned to his previous status under § 1225 pending expedited removal. *Valera-Marin v. Lyons*, 2025 WL 3687978 (D.N.M. Dec. 19, 2025) (Gonzales, J.).

Petitioner cites some cases where courts found that a noncitizen who remains in the United States after their parole expires or is terminated becomes subject to the provisions of 8 U.S.C. §

1226. *See* Doc. 17 at 2 (citing *Walizada v. Trump*, 2025 WL 3551972 (D. Vt. Dec. 11, 2025); *Hyppolite v. Noem*, 808 F.Supp.3d 474 (E.D.N.Y. 2025)). But the Court in *Walizada* resolved the case on constitutional grounds, declining to resolve the statutory question of whether a former parolee can remain or revert to an "arriving alien." 2025 WL 3551972, at *15. And in *Hyppolite*, the Government's own documentation on the date of the petitioner's arrest stated that his detention was authorized under § 1226(a), undermining any claim that that petitioner should be detained under § 1225. 808 F.Supp.3d at 485. Further analysis undertaken by the *Hyppolite* court focuses on § 1225(b)(2)(A), *id.* at 486-90, likely because the exact status of that petitioner's parole was unclear, *see id.* at 480 n.4. The Court finds the analysis in these cases insufficient to overcome the plain language of the statute and regulations. The statutory language and case law makes clear that after his parole ended, Petitioner once again became subject to this provision mandating his detention.

**C. The Due Process Clause applies to Petitioner and requires he be provided an opportunity for release on bond.**

1. <u>The "entry fiction" limits Petitioner's due process rights with respect to admission and parole, not necessarily pre-removal detention.</u>

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. The Due Process Clause's protections extend to **all** persons **within the United States**, including noncitizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693 (emphasis added). However, under the "entry fiction," noncitizens "who arrive at ports of entry— even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (citation and internal quotation omitted); *accord Sierra*, 258 F.3d at 1218. This is because such noncitizens cannot be

said to have "effected an entry" into the country, so they have "only those rights regarding admission that Congress has provided by statute." *Thuraissigiam*, 591 U.S. at 140. In *Thuraissigiam*, the Supreme Court applied this principle to a noncitizen challenging his expedited removal after he was detained just 25 yards over the border after entering without inspection. *See id.*

The Tenth Circuit has also applied the entry fiction in the parole context, holding that noncitizens possess no liberty interest in being released on parole and therefore limiting their due process rights regarding parole to the procedures authorized by Congress. *Sierra*, 258 F.3d at 1218-19. The facts in *Sierra* center around a Cuban citizen who was paroled into the United States, later convicted of several crimes, ordered removed, and remained detained when Cuba would not accept him back. *Id.* at 1216. After he was initially approved for parole, that approval was withdrawn after an alleged fight while in prison. *Id.* He filed a habeas petition, arguing he was entitled to a hearing on the withdrawal of his parole. *Id.* Applying the entry fiction and limiting his due process rights, the Tenth Circuit dismissed his petition because "[n]either the statutes nor the governing regulations require a hearing on parole withdrawal." *Id.* at 1219.

Petitioner in this case has not "effected an entry" into the country, like the petitioner in *Thuraissigiam*, and was instead paroled, like the petitioner in *Sierra*. Applied to Mr. Mendibaev, the above-cited case law makes clear that Petitioner's due process rights regarding his parole and his admission into the country are limited to the procedures authorized by Congress in the relevant statutes and regulations. However, the similarities stop there, and there are important distinctions that limit the applicability of *Thuraissigiam* and *Sierra*. First, Petitioner does not challenge the removal proceedings against him, nor does he argue he is entitled to be released on parole. Instead, he argues that during his two years of living in the United States, he accrued a general liberty

interest which entitles him to release, or at the very least, an opportunity to seek bond while his removal proceedings are pending. Doc. 17 at 13-15. Some district courts grappling with similar facts have more narrowly read *Thuraissigiam* as protecting Congress's "sovereign prerogative" over admission and exclusion and limiting noncitizens' due process rights regarding **admission**, not necessarily regarding **pre-removal detention**. *See, e.g., Rincon v. Hyde*, 810 F.Supp.3d 101, 110-11 (D. Mass. 2025); *Walizada v. Trump*, 2025 WL 3551972, at *16 (D. Vt. Dec. 11, 2025).

Second, Petitioner was not arrested 25 yards from the border shortly after entering, like the petitioner in *Thuraissigiam*, but rather was arrested in Chicago after living there freely with his family for over two years. And unlike the petitioner in *Sierra*, Mr. Mendibaev has no criminal history and has not been ordered removed. These factual distinctions are important. To apply the entry fiction in this case "requires a much greater sleight of hand than is provided for in those prior cases." *Rincon*, 810 F.Supp.3d at 112; *see also Tenamasa-Lema v. Hyde*, 810 F.Supp.3d 244, 253 (D. Mass. 2025) ("[E]ven *without* disturbing the metaphysical 'entry fiction' that may obstruct, in some senses, our ability to admit that a non-citizen is really 'here,' one can still constitutionally recognize Petitioner's actual life in this country—his years as part of our community—[is] not so easily set aside."). These facts further support distinguishing *Thuraissigiam* and *Sierra* and finding that Petitioner's due process rights with respect to his **detention pending removal proceedings** flow not from the entry fiction but from his geographic presence inside the country.

It is true that detention during removal proceedings has been upheld as "a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). Nevertheless, the Due Process Clause imposes limits even on mandatory immigration detention; it must "bear[] a reasonable relation to the purpose for which the individual was committed." *Id.* at 527 (quoting *Zadvydas*, 533 U.S. at 690). The petitioners in *Demore* challenged their detention under 8 U.S.C.

10

§ 1226(c), which at the time, mandated detention for noncitizens convicted of aggravated felonies. The purpose of detention, the Supreme Court found, was to ensure that noncitizens convicted of crimes appeared for immigration hearings and did not remain at large in the United States unlawfully. *Id.* at 528. No such justification applies to noncitizens like Mr. Mendibaev, who have no criminal history whatsoever, have pending applications for affirmative immigration relief, and possess significant ties within the United States. *See Rincon*, 810 F.Supp.3d at 113-14 (distinguishing *Demore*). Nor has the Government articulated how mandatory detention of formerly paroled asylum seekers is reasonably related to ensuring appearance in immigration court or any other immigration purpose. *See* Doc. 15. Accordingly, just like any other noncitizen present within the United States, the Court finds that Mr. Mendibaev's detention is limited by the demands of the Due Process Clause.

2. Petitioner accrued a liberty interest in freedom from immigration detention.[1]

Having established that Petitioner is protected by the Due Process Clause for the purposes of his detention, we now must determine the contours of that protection in this case. Courts analyze procedural due process claims in two steps: the first asks whether there exists a protected liberty interest under the Due Process Clause, and the second examines the procedures necessary to ensure any deprivations of that protected liberty interest accords with the Constitution. *See Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

The Supreme Court has said multiple times that individuals have a liberty interest in their conditional release. *See, e.g., Morrissey v. Brewer*, 408 U.S. 471 (1972). And courts have answered

---

[1] The Court recognizes that Petitioner has no liberty interest in release on parole. *See Sierra*, 258 F.3d at 1218. However, the Court distinguishes between the specific interest in being paroled and a more general liberty interest in freedom from immigration detention while removal proceedings remain pending.

the first question—whether there is a protected liberty interest—by comparing the facts of the case before them to those in *Morrissey*, where release allowed the individual "to do a wide range of things" characteristic of everyday life, including being "with family and friends and [forming] the other enduring attachments of normal life." *Id.* at 482.

Like the parolee in *Morrissey*, Mr. Mendibaev's parole allowed him to do a wide range of things. Petitioner lived in Chicago with his wife and their two young children, where he worked lawfully to support his family with an Employment Authorization Document valid through 2030. Doc. 1 at ¶ 24. He was active in his children's school community, the Bateman School, and he regularly attended mosque and developed strong ties within his religious community. *Id.* Petitioner also sought lawful status in this country by filing an asylum application on behalf of himself and his family. *Id.* at ¶ 22. These relationships and obligations are the very kind contemplated in *Morrissey* and demonstrate the liberty interest accrued by Petitioner during the more than two years he has lived with relative freedom in this country.

3. <u>Applying the *Mathews v. Eldridge* framework, the Due Process Clause requires that Petitioner be provided a bond hearing.</u>

In analyzing what procedures sufficiently protect due process in the immigration context, courts have applied the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206-07 (9th Cir. 2022) (assuming without deciding that *Mathew* applies); *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020); *Hernandez v. Cremer*, 913 F.2d 230, 238 (5th Cir. 1990). Several district courts within the Tenth Circuit, too, have applied *Mathews* when addressing due process claims related to immigration detention. *See, e.g., Hernandez-Parrilla v. de Anda-Ybarra*, 2025 WL 3632769, at *5 (D.N.M. Dec. 15, 2025); *Barreno v. Baltasar*, 2025 WL 3190936, at *3 (D. Colo. Nov. 14, 2025); *Garcia Cortes v. Noem*, 2025 WL 2652880, at *4 (D. Colo. Sept. 16, 2025).

12

To determine the process due an individual, *Mathews* requires the Court to balance (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of such interest through the procedures used and the probable value of additional or different procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail. 424 U.S. at 335.

Turning to the first *Mathews* factor, the Court finds that Petitioner has a significant private interest in remaining free from detention after living freely outside of immigration custody. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that the [Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. As mentioned previously, Petitioner was out of immigration custody for over two years before being re-detained by ICE, during which time his interest in release grew even stronger as he worked and lived freely alongside family and other community members. His private interest in freedom from detention is therefore substantial. *See* Doc. 1 at ¶ 5.

The second *Mathews* factor is a closer call. The risk of erroneous deprivation is considerable in this case where ICE previously paroled Petitioner in order to seek asylum, Petitioner's affirmative asylum application remains pending, the Government attempted to unlawfully terminate Petitioner's parole early through a mass email, and the Government did not extend Petitioner's parole despite his pending asylum application, compliance with the conditions of his parole, and significant family and community ties in the United States. On the other hand, as the Government points out, Petitioner is properly subject to mandatory detention under the statute. *See* Doc. 15 at 8. In considering the probable value of additional or different procedural safeguards, the equities tip in favor of a bond hearing, rather than release, where the Petitioner still bears the burden of showing why release on bond is warranted in this case. This helps ensure

Petitioner is not erroneously deprived of his liberty interest in release while recognizing that detention is mandated by the statute.

Finally, the third *Mathews* factor favors Petitioner as well. While the Government certainly has a strong interest in enforcing its immigration laws, its interest in detaining noncitizens absent a rational reason for doing so is low. The justification for mandatory detention of "arriving aliens" subject to expedited removal carries little weight in this case, where Petitioner has developed significant ties to the United States and where his removal proceedings are not being dealt with in an expedited fashion. Requiring a bond hearing does not impose a significant fiscal or administrative burden on the Government, nor does it undermine the Government's "sovereign prerogative . . . to decide which [noncitizens] to admit[,]" *Landon*, 459 U.S. at 32, as Petitioner's removal proceedings—and the Government's discretion over them—will continue regardless of his detention status.

On balance, the Court finds that under the three *Mathews* factors, the Due Process Clause entitles Petitioner to an opportunity to seek release on bond at a custody redetermination hearing. However, given that the statutory scheme applicable to Petitioner contemplates mandatory detention, the Court declines to shift the burden of proof to the Government at said hearing. As is typical of custody redetermination hearings in immigration court, the Petitioner will bear the burden of demonstrating that he is not a flight risk or a danger to his community.

In requiring a bond hearing, this Court does **not** interfere with Petitioner's removal proceedings in immigration court or make any finding regarding his admissibility and/or eligibility for parole. Instead, the Court limits itself to assessing Petitioner's statutory and constitutional rights regarding pre-removal detention, which falls well within its authority to do. *See Zadvydas*,

533 U.S. at 687; *Soberanes v. Comfort*, 388 F.3d 1305, 1310 (10th Cir. 2004) ("Challenges to immigration detention are properly brought directly through habeas.").

### IV.
### CONCLUSION

For the reasons stated above, the Court will **GRANT IN PART** Petitioner's Petition for Writ of Habeas Corpus.

**IT IS THEREFORE ORDERED** that Respondents provide Petitioner an individualized bond hearing before a neutral Immigration Judge ("IJ") within 7 days of entry of this Order. If Petitioner does not receive such a hearing on or before Saturday, April 11, 2026, he shall be immediately released. The assigned IJ is hereby ordered not to deny bond based solely on a lack of jurisdiction under the Board of Immigration Appeals' decision in *Matter of Yajure Hurtado*.

**IT IS FURTHER ORDERED** that the parties submit a joint status report to the Court no later than Monday, April 13, 2026, confirming whether a bond hearing was held and the result of said hearing.

**IT IS SO ORDERED.**

HONORABLE DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE

15